2024 IL App (1st) 240569-U
No. 1-24-0569

FIRST DIVISION
October 15, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF: <br> K.H., | ) <br> ) <br> ) | Appeal from the Circuit Court <br> of Cook County, Illinois, <br> Child Protection Division |
|    Minor-Respondent-Appellee | ) <br> ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) <br> ) | No. 20JA1612 |
|    Petitioner-Appellee, | ) <br> ) | |
| v. | ) <br> ) | |
| Clarence H. | ) <br> ) | The Honorable <br> Lisa M. Taylor, |
|    Respondent-Appellant.) | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's order terminating respondent's parental rights, as the findings of respondent's unfitness were not against the manifest weight of the evidence.

¶ 2    Respondent-Appellant Clarence H. ("respondent") appeals from the circuit court's order that terminated his parental rights with respect to his son, minor-respondent-appellee, K.H. (the minor). For the following reasons, we affirm the circuit court.

¶ 3                                    BACKGROUND

¶ 4      The minor, respondent's biological son, was born on December 10, 2018[1]. He resided with his natural mother until November 27, 2020, when his natural mother and her adult brother (the minor's uncle) were found shot to death, allegedly by respondent. According to an "Integrated Assessment" prepared by the Illinois Department of Children and Family Services (DCFS), "it was believed that [the minor] was present in the home during the homicides and was then abducted by" respondent. Respondent was ultimately charged with the murders of the minor's mother and uncle.

¶ 5      Following the homicides, the minor's whereabouts were unknown until a paternal relative brought the minor to a police station on December 1, 2020. On December 3, 2020, the State filed a petition for adjudication of wardship, which alleged that respondent and the minor's natural mother had a history of domestic violence, and that respondent's whereabouts were unknown. The State alleged that the minor was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2022)) and abused due to a substantial risk of injury (*id*. §2-3(2)(ii).

¶ 6      On December 3, 2020, the court granted temporary custody to the DCFS Guardianship Administrator with the right to place the minor. On the same date, the Cook County Public Guardian was appointed as the minor's guardian *ad litem*.

¶ 7      The record reflects that respondent's whereabouts were unknown for a number of months after the November 2020 homicides. Although the exact date of his arrest is unclear, the record reflects that respondent was in federal custody by March 2021.[2] An attorney was appointed for

---

[1] The record reflects that on May 7, 2021, the circuit court made a finding of respondent's paternity based on genetic testing.

[2] One of the service plans prepared by DCFS in this matter states that "birth father is currently federally incarcerated as of March 2021." At the termination hearing, the minor's case worker testified that respondent had been incarcerated since March 21, 2021. The record includes a June 25, 2021 notice of a hearing reflecting that respondent was housed at the Metropolitan Correctional Center, a federal detention facility in Chicago.

respondent in this matter on March 11, 2021. On that date, the court ordered that any visitation by respondent with the minor would be supervised by DCFS, subject to DCFS' discretion as to whether such visits "would be appropriate and in the minor's best interests." DCFS never authorized any visitation.

¶ 8     On August 2, 2021, respondent's appointed counsel, the Public Defender of Cook County, filed a motion to withdraw based on respondent's desire to be represented by other counsel. The motion was granted. In December 2021, the court entered an order appointing a different attorney, Steven Silets, as respondent's counsel.

¶ 9     Following an adjudication hearing, on August 4, 2022, the court entered an adjudication order finding that the minor was neglected due to "lack of care" and an injurious environment. On September 12, 2022, the court entered a disposition order finding that the mother is deceased and the respondent was unable to care for, protect, train, or discipline the minor. The court placed the minor in the custody of the DCFS Guardianship Administrator with the right to place the minor. On the same date, the court entered a permanency order setting the permanency goal of "return home pending status."

¶ 10     On September 16, 2022, respondent filed a notice of appeal from the adjudication and dispositional findings, commencing a prior appeal, no. 1-22-1410. Respondent's appointed appellate counsel subsequently filed a motion to withdraw and supporting brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), explaining counsel's belief that there were no viable challenges to the adjudication and dispositional findings. Respondent did not file a response to that motion. This court entered a summary order granting the motion to withdraw and affirming the judgment of the circuit court. *In re K.H.,* No. 1-22-1410 (Feb. 28, 2023)(unpublished summary order).

¶ 11    On November 2, 2022, a new attorney, Ellen Weisz, was appointed for respondent in this matter.

¶ 12    On May 15, 2023, the court entered a permanency order that changed the permanency goal to "substitute care pending court determination on TPR [termination of parental rights]." The order stated the reasons for this goal were that respondent was incarcerated "with pending charges, including murder of the mother and kidnapping of the minor" without an anticipated release date, and "the minor is placed in a pre-adoptive home and is doing well there."

¶ 13    On May 24, 2023, the State filed a petition seeking termination of respondent's parental right and appointment of a guardian with the right to consent to adoption. The State alleged that respondent was unfit under section 50/1(D)(b) of the Adoption Act due to his failure to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare. 750 ILCS 50/1(D)(b) (West 2024). The State also alleged he was unfit under subsection (m) of the same provision (750 ILCS 50/1(D)(m) (West 2024)), based on his failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child or his failure to make reasonable progress toward the return of the child within 9 months after the adjudication of neglect or within a 9 month period after that finding.[3] The State's petition averred that the minor had resided with foster parents since November 27, 2020, the foster parents desired to adopt him, and adoption was in the minor's best interest.

¶ 14    In a supplemental pleading, the State clarified that the 9-month periods corresponding to its claim of unfitness under section 50/1(D)(m) were: (1) August 5, 2022 to May 5, 2023 and (2) April 5, 2023, to January 5, 2024.

---

[3] The State's petition asserted unfitness under a third ground, that he had behaved in a depraved manner pursuant to subsection (i) of section 50/1(D) of the Adoption Act. 750 ILCS 50/1(D)(i) (West 2024). However, the State subsequently withdrew its unfitness allegation based on that provision.

¶ 15    On February 23, 2024, the court conducted a termination hearing. The transcript reflects that respondent, who remained incarcerated, had remote access to those proceedings via Zoom but decided not to appear or participate. On the record, the court asked a Cook County Sheriff to confirm that he was with respondent, but that respondent had "refused to come back onto the Zoom Court Hearing." The sheriff confirmed this.

¶ 16    Without objection, the court admitted the State's exhibits, including the natural mother's death certificate; a May 2021 "Child/Parent Psychotherapy Preliminary Report", the Integrated Assessment, and six separate service plans prepared between May 2021 and November 2023.

¶ 17    The State called Regina Ruffin from the agency Volunteers of America, Illinois. She testified she was the case manager for the minor's family from September 2023 until February 2024.

¶ 18    Ruffin testified that after the birth mother was murdered in 2020, the minor was taken by respondent and then "dropped off at another location." Ruffin testified that respondent's whereabouts were unknown until March 2021, when he was incarcerated at a federal facility. She did not know the status of any federal charges against him. Ruffin stated that respondent was currently in Cook County jail and had been charged with two counts of first degree murder. Respondent had not yet been tried on those charges, and Ruffin did not know when they might be resolved.

¶ 19    Ruffin testified that respondent's location was unknown when the Integrated Assessment was completed, but the assessment recommended that he undergo a "Parent Capacity Assessment", services for domestic violence, and a "Legal Consultation" to "determine if 'Return Home' would be a viable option for the minor."

¶ 20    Ruffin testified there was no provider available to provide domestic violence services to respondent while incarcerated. She also stated that her agency consulted with DCFS, but "there was no P.C.A. [Parenting Capacity Assessment] provider available to go to the jail to do the assessment." Thus, those services had not been completed. Ruffin testified there were no "documents in the file indicating that [respondent] completed any services while incarcerated."

¶ 21    Ruffin testified that when respondent was located in March 2021, her agency conducted a "clinical staffing" but determined that visits between respondent and the minor would be "inappropriate." She stated the agency's "recommendation still stands", noting that the agency relied on a psychotherapist who was providing services to the minor.

¶ 22    To Ruffin's knowledge and based on her review of records, respondent never contacted the agency to inquire how the minor was doing or to send the minor any cards or letters.

¶ 23    Ruffin stated that her only communication with respondent occurred when she was in a "breakout room with [respondent] and his attorney" at the "last court hearing" in October 2023. At that time, she introduced herself to respondent and said she would send him a letter. Ruffin testified that later in October 2023, she sent a letter to respondent at the Cook County jail, including her contact information. Respondent did not respond to the letter.

¶ 24    Ruffin confirmed that the minor had no type of visitation with respondent, either in person or virtually.

¶ 25    On cross-examination by respondent's attorney, Ruffin agreed that when she met respondent, he had asked for pictures of his son. She acknowledged she had not sent him a photograph of the minor. When counsel asked if respondent had refused to engage in services, Ruffin answered: "I never had a conversation with him about services so I'm not sure what he did prior to me." Ruffin again testified there was no provider available to conduct domestic violence

classes or a parenting capacity assessment of respondent while he was incarcerated. Ruffin acknowledged that there were some domestic violence providers who provide services remotely through Zoom, but she did not attempt to make a referral for one of those providers. She was not aware of any parenting capacity evaluators who provide services via Zoom. Ruffin also acknowledged that, since becoming the case manager in September 2023, she never asked respondent if he wanted to engage in services.

¶ 26 On redirect examination, Ruffin testified that her October 2023 letter to respondent identified her agency, "told him what services he needed," and shared her contact information. She told him that he "could reach out to me if needed to as well as what was recommended for him to engage in." He never responded to her.

¶ 27 Ruffin testified that she had not sent photos of the minor to respondent, despite respondent's request, after discussing the issue with a prior supervisor on the case and the minor's psychotherapy provider. The recommendation of those providers was not to send the photos.

¶ 28 On questioning by the Public Guardian, Ruffin testified that the letter she sent to respondent listed domestic violence services as well as a parenting capacity assessment. She testified that by that point, the goal was no longer "Return Home." In turn, she stated that it was not the agency's responsibility to refer those services directly to him.

¶ 29 After Ruffin's testimony, the State asked the court to find that respondent was unfit under grounds "b" and "m" of section 50/1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024). The State averred that he was incarcerated since March 2021 and has not been able to engage in any recommended services. The State cited *In re J.L.,* 236 IL 2d 329 (2010) for the proposition that time spent incarcerated does not toll the time a parent has to make reasonable progress. The Public Guardian joined the State's argument and also cited *In re J.E.,* 2019 IL App (1st) 190467

to argue that time spent incarcerated "does in fact go to unfitness if it impedes or hinders progress toward reunification." The Public Guardian argued that respondent's continuous incarceration for nearly three years impeded his progress and "can be used *** as a ground for unfitness."

¶ 30　Respondent's counsel argued that he had no opportunity to engage in services. Counsel noted it was "unfortunate that our penal system is so uncooperative in helping our prisoners. He did express an interest in being with his child. He did ask for pictures of the child; and the agency just determined that he could not work towards return of his child." Counsel argued that "he really had no opportunity to or chance of overcoming the case."

¶ 31　In its ruling, the court remarked that although respondent was incarcerated, the record reflected that "as far as March of 2021 presumably when he was located, he was aware that this case was pending" and that a finding of paternity was made in May 2021. Thus, "there was quite a bit of time before there was a change in goal; and it is unfortunate that there was no interest in [the minor] expressed by his father at that time." The court also noted that respondent "chose not to participate this afternoon."

¶ 32　The court found that the State had met its burden to show by clear and convincing evidence that respondent was "unfit" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(West 2024)), pursuant to subsections (b) and (m) of that provision. That is, the court found respondent was unfit fit due to "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare," (*id.* §50/1(D)(b)) and due to "failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during

any 9-month period following the adjudication of neglected or abused minor ***." *id.* § 50/1(D)(m).[4]

¶ 33    The court proceeded immediately to conduct a "Best Interests" hearing, at which the State again called Ruffin to testify. Ruffin stated that the minor resided in the home of a maternal relative, which was "his only placement since coming into care." Two parents and two older children resided in the home. Ruffin last visited the home on January 19, 2024; she found the home to be safe and appropriate, with no signs of abuse or neglect. The minor appeared to be happy and had a very "loving relationship" with the foster parents, whom he called "mom" and "dad." Ruffin testified that the minor was now five years old and attended a kindergarten, where he was doing well. The minor was in individual therapy and also saw a psychotherapist for trauma-informed therapy. Ruffin had no concerns about the foster parents' ability to care for the minor. She testified that the minor indicated a desire to remain in the home.

¶ 34    Ruffin testified that the agency determined it would be appropriate to move forward with the termination of parental rights "because the minor has been in the home since case opening," and the foster parents and the minor were "well bonded." The agency recommended a goal of adoption upon termination of respondent's parental rights.

¶ 35    After Ruffin's testimony, the State noted for the record that "throughout the time that we have been holding this proceeding this afternoon, no one has come in the [Zoom] waiting room claiming to be [respondent]." The State asked the court to find it was in the minor's best interest to terminate respondent's parental rights. The Public Guardian joined in the State's argument.

---

[4] The corresponding written order states the court found respondent unfit on the grounds of "(b) interest, concern, responsibility, (m) failure to make reasonable efforts/progress during the 9 month time frames plead." Thus, the court indicated it found him unfit under subsection (b) as well as both (m)(i) and (m)(ii).

Respondent's counsel argued termination was an "extreme remedy," noting that it is common for children to develop "curiosity about their roots" when they grow older.

¶ 36    The court found the State proved by a preponderance of the evidence that it was in the minor's best interest to terminate respondent's parental rights.

¶ 37     The court appointed a guardian with the right to consent to adoption of the minor. The court also entered a permanency order with a goal of adoption.

¶ 38    Respondent filed a timely notice of appeal from the order terminating his parental rights.

¶ 39                                    ANALYSIS

¶ 40    Respondent contends the court erred in finding him unfit and finding that termination of his parental rights was in the minor's best interests.

¶ 41    "The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2016) provides for the termination of parental rights in a two-step process." *In re M.R.,* 2020 IL App (1st) 191716, ¶ 26. "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). "After finding the parent unfit, the court next considers whether it is in the best interests of the child to terminate parental rights." *In re M.R.,* 2020 IL App (1st) 191716, ¶ 26.

¶ 42    Section 1(D) of the Adoption Act lists the grounds under which a parent may be found unfit for purposes of terminating parental rights. 750 ILCS 50/1(D) (West 2024). "A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) (citing *In re D.D.,* 196 Ill. 2d 405, 422 (2001)).

¶ 43    "Although any one ground, properly proven, is sufficient to enter a finding of unfitness, parental unfitness must be established by clear and convincing evidence." *In re Tyianna J.*, 2017

IL App (1st) 162306, ¶ 88. We will not set aside a circuit court's finding that there was clear and convincing evidence of respondent's unfitness unless that finding is against the manifest weight of the evidence. *Id.* "A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record." *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 44    Here, respondent suggests the court's findings of unfitness pursuant to both subsections (b) and (m) of section 1(D) of the Adoption Act were against the manifest weight of the evidence. We address these in turn.

¶ 45    <u>Failure to Maintain a Reasonable Degree of Interest, Concern or Responsibility</u>

¶ 46    We first address respondent's challenge to the court's determination that the State proved he was unfit due to "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" under subsection (b) of section 1(D). 750 ILCS 50/1(D)(b) (West 2024). In doing so, he emphasizes that he "was incarcerated at a facility that limited caseworker contact with him" and asserts that he was "cut off" from caseworkers. He also points out that "visitation was not a viable option", as "the agency had ruled it out" well before Ruffin contacted him by letter in October 2023.

¶ 47    Respondent also argues the court made this unfitness determination after an "uncomfortably short hearing" in which Ruffin was the only witness. He asserts that her only testimony as to respondent's alleged lack of interest was that, to her knowledge, respondent had not sent the minor any letters or other correspondence. Respondent also points to Ruffin's testimony that he requested photographs of his son, but the agency declined to provide them. Respondent claims that the finding of unfitness as to subsection (b) was inappropriate due to his incarcerated status and the agency's "failure to link up with him, coupled with their decision to limit his interaction" with the minor.

¶ 48    Although we recognize respondent's incarcerated status, we cannot say that the trial court's finding of unfitness based on subsection (b) was against the manifest weight of the evidence.

¶ 49    "The plain meaning of the phrase 'failure to maintain a reasonable degree of interest, concern or responsibility as to the child welfare' in subsection (b) includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern or responsibility are inadequate regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 26. That is, "[s]ubsection (b) contains no state of mind requirement, nor does it carve out an exception for faultless failure." *Id.*

¶ 50    "A finding of unfitness under ground (b) is based on a subjective analysis. [Citation.] This ground does not focus on the parent's success but, rather, the reasonableness of his or her efforts and takes into account the parent's difficulties and circumstances." *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. "In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1064 (2006) (citing *In re Adoption of Syck*, 138 Ill. 2d 255).

¶ 51    "[C]ourts consider a parent's conduct in the context of the circumstances in which it occurs," including "conduct of others that hinders visitation, and the motive underlying the failure to visit. [Citation.]" *Id.* "However, a parent need not be at fault to be unfit, and she is not fit merely because she had demonstrated some interest in or affection for her child. [Citation.] *If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and visits to the child,* taking into account the frequency and nature of those contacts. [Citation.]" (Emphasis added). *Id.*

¶ 52    With these principles in mind, the mere fact of respondent's incarceration did not preclude the trial court from finding that respondent was unfit for failure to maintain a reasonable degree of interest, concern or responsibility. Nor can we say this finding was against the manifest weight of the evidence. We acknowledge that the agency did not permit in-person visitation (which is not surprising, since respondent allegedly killed the minor's mother and uncle in the minor's presence). Nevertheless, there is no evidence that respondent sought to communicate with the minor from the time he was taken into custody in March 2021 through the time of the termination hearing in February 2024. The only evidence that he expressed an interest in the minor was Ruffin's testimony that he requested photographs of the minor in October 2023, more than two and a half years after respondent was taken into custody.

¶ 53    We also note that, while respondent complains that the hearing was "uncomfortably short," the transcript reflects that he had access to the hearing via Zoom but opted not to observe or participate. We recognize that the burden to prove unfitness is on the State. However, it is puzzling why respondent did not take the opportunity to directly communicate to the court his wishes with respect to his son. Had he testified, he could have provided evidence about any additional efforts he made to maintain a relationship with his son. For whatever reason, he opted not do so. Thus, Ruffin's testimony about the lack of respondent's efforts was uncontroverted.

¶ 54    In sum, the evidence indicated that over nearly three years of incarceration, respondent made virtually no efforts to communicate with or inquire into the well-being of his son. In turn, we cannot say the court erred in finding respondent unfit under section1(D)(b) of the Adoption Act, due to failure to maintain a reasonable degree of interest concern, or responsibility as to the minor's welfare. 750 ILCS 50/1(D)(b) (West 2024).

¶ 55        Findings of Unfitness Under Subsection 1(D)(m) of the Adoption Act

¶ 56    We have determined the trial court did not err in finding respondent unfit under subsection (b). We recognize that, as the grounds set forth in section 1(D) of the Adoption Act each provide a discrete basis for a finding of unfitness, a finding of unfitness on any ground alleged by the State is sufficient to support termination of parental rights. *In re C.W.,* 199 Ill. 2d 198, 217 (2002). Nonetheless, even assuming *arguendo* that the trial court erred with respect to subsection (b), we would nonetheless affirm the trial court's finding that the State proved unfitness for failure to make either "reasonable efforts" or "reasonable progress" under subsection (m.) 750 ILCS 50/1(D)(m) (West 2024).

¶ 57    Under subsection (m), a finding of unfitness may be based on "[f]ailure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication *** of neglect or abused minor under Section 2-3 of the Juvenile Court Act of 1987 *** or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m) (West 2024). That is, "section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." (Emphasis in original.) *In re C.N.,* 196 Ill. 2d 181, 210 (2001). Here, the trial court's written termination order indicated it found respondent unfit under both parts of subsection (m), as it found he failed to make "reasonable efforts/progress."

¶ 58    As to the first of these bases, under subsection 1(D)(m)(i), "[t]he reasonable efforts inquiry is a subjective one, focusing on the efforts of the parent that would be reasonable for the parent under the circumstances." *In re D.P.,* 2024 IL App (1st) 231530, ¶ 42. "The inquiry is narrow, as

it considers only the correction of those conditions originally providing the basis for removal of the children." *Id.*

¶ 59    In contrast, under subsection 1(D)(m)(ii), "[w]hether a parent has made reasonable progress 'is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent.' " *In re Je. A*., 2019 IL App (1st) 190467, ¶ 62 (quoting *In re Daphnie E.,* 368 Ill. App. 3d at 1067.) "At minimum, reasonable progress necessitates measurable or demonstrable movement toward the goal of reunification." *Id*. (citing *In re Daphnie E.,* 368 Ill. App. 3d at 1067). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re D.P*., 2024 IL App (1st) 231530, ¶ 43 (citing *In re Je. A*., 2019 IL App (1st) 190467, ¶ 62).

¶ 60    Significant to this case, our supreme court has held that, for purposes of assessing whether a parent has made reasonable progress during the relevant 9-month period, "[t]here is no exception for time spent in prison." *In re J.L.,* 236 Ill. 2d 329, 340 (2010). In that case, the State alleged the respondent was unfit based on a prior version of the same statute, for failure " 'to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor.' " *Id*. at 338 (quoting 750 ILCS 50/1/(D)(m)(iii) (West 2008)). The appellate court reversed the circuit court's termination of the respondent's parental rights, reasoning that because respondent was incarcerated for six of the nine months at issue, she was "effectively given three months *** to demonstrate reasonable progress" and thus lacked an "adequate opportunity" to demonstrate whether she could make progress. *In re J.L.*, 236 Ill. 2d at 336.

¶ 61    Our supreme court reversed the appellate court, explaining that the relevant statutory language was "clear and ambiguous" and "simply provides that a ground for a finding of unfitness

is the '[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication" of the minor. *Id.* at 340. Because the statutory language was clear, courts could not read into it an exception for incarcerated parents. See *id.* Moreover, our supreme court noted that other language in the Adoption Act showed "the legislature was well aware of the possibility that a parent subject to termination proceedings would be incarcerated." *Id.*

¶ 62     Consistent with *In re J.L.,* our court has recognized that a respondent's parental rights may be terminated due to "failure to make reasonable progress," even if the parent's incarceration impeded progress toward reunification. *In re Je. A.,* 2019 IL App (1st) 190467, ¶ 73. In that case, respondent was incarcerated for approximately six of the nine months pertinent to the finding of unfitness for Ja. A., one of the three minors at issue. We recognized that "respondent's incarceration certainly impeded his progress" since "respondent did not have any visitation with any of his children and was not able to complete any of the necessary services", such as "the single-parent coaching that respondent needed." *Id.* Nevertheless, our court noted that the fact "[t]hat respondent's personal circumstances prevented him from making reasonable progress is irrelevant to the objective standard. [Internal quotation marks omitted.]" *Id.*

¶ 63          The Court Did Not Err in Finding Unfitness Under Subsection (m)(ii)

¶ 64     In his briefing, respondent attacks the finding of unfitness due to failure to make reasonable efforts under subsection m(ii)) by pointing to "dearth of facts in the record that indicates what services, if anything, [respondent] could have accomplished" during the 9-month periods identified by the State. He emphasizes Ruffin's testimony that most services could not be provided to him while incarcerated, and that while she knew domestic violence service providers who worked via Zoom, she did not attempt to refer them for him. He also notes her testimony that she did not

attempt to make any service referrals after October 2023, because her agency was not obligated to do so once the permanency goal for the minor was changed to termination of parental rights.

¶ 65    Defendant essentially suggests that the circumstances of his incarceration preclude a finding that he failed to make reasonable progress.  He relies on *In re Gwynne P.*, 346 Ill. App. 3d 584 (2006), in which this court upheld the respondent mother's unfitness on a separate ground but reversed the trial court's findings of unfitness due to failure to make reasonable progress efforts under subsection (m). This court noted that due to respondent's incarceration (including a  period in which she was "held in segregation"), respondent did not have access to all services recommended by the DCFS. *Id*. at 595. Nonetheless, she had completed a recommended psychiatric evaluation and parenting classes, put herself on a waiting list for other services, and began substance abuse classes. In addition, she sent at least seven letters to the agency requesting visits with her child. *Id.* Our court found that because respondent "took several steps toward completing" recommended services and made "persistent efforts to schedule visits with [the minor]," she made a "minimum measurable or demonstrable movement toward reunification." *Id*. at 595-96.  Thus, the trial court's "finding that she failed to make reasonable progress was against the manifest weight of the evidence." *Id*. at 596.

¶ 66    Respondent's reliance on *In re Gwynne P.* is unavailing for multiple reasons. First, it preceded our supreme court's decision holding that incarceration does not toll the time in which a parent must demonstrate reasonable progress for purposes of subsection (m).  *In re J.L.*, 236 Ill. 2d at 340.  Moreover, *In re Gwynne P.* is clearly distinguishable on the facts. The respondent in *In re Gwynne P.* made efforts to complete recommended services, as well as persistent efforts to contact the minor at issue. Simply put, there is no evidence here that respondent attempted to complete any recommended services or made any attempt to communicate with the minor during

either applicable 9-month period (August 5, 2022 to May 5, 2023 and April 5, 2023 through January 5, 2024).

¶ 67    Furthermore, we reiterate that the standard for unfitness due to failure to make "reasonable progress" under subsection (m)(ii) is an objective one, "based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Je. A*, 2019 IL App (1st) 190467 ¶ 62. It requires "measurable or demonstrable movement toward" reunification," such that "the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id*. (citing *In re Daphnie E*., 368 Ill. App. 3d at 1067).

¶ 68    Applying this objective standard, it is apparent from the record that respondent made little or no progress towards completing any services or otherwise moving toward unification with the minor. It is also clear that, given the pendency of the murder charges, the court could not order the minor returned to respondent in the near future.

¶ 69    Accordingly, we reject respondent's challenge to the court's finding of unfitness under subsection (m)(ii)  (750 ILCS 50/1(D)(m)(ii) (West 2024) for failure to demonstrate reasonable progress.

¶ 70        The Court Did Not Err in Finding Unfitness Under Subsection (m)(i)

¶ 71    Having concluded the court did not err in finding respondent unfitness due to lack of reasonable progress under subsection m(ii), there is no need for us to evaluate whether unfitness was properly found under the independent basis in subsection (m)(i), *i.e*., failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor. See *In re C.N*., 196 Ill. 2d at 210 ("[S]ection 1(D)(m) provides two independent bases for a finding of unfitness"); *In re A.R.,* 2023 IL App (1st) 220700, ¶ 66 ("Only one listed ground of unfitness need be proven to support a finding that a parent is unfit. [Citation.])

¶ 72    In any event, we could not say the trial court erred in finding respondent unfit on this ground. We again recognize that the inquiry as to "reasonable efforts" under subsection (m)(i) "is a subjective one, focusing on the efforts of the parent that would be reasonable for the parent under the circumstances." *In re D.P.,* 2024 IL App (1st) 231530, ¶ 42.

¶ 73    Notwithstanding the circumstances of his incarceration, there was simply no evidence that respondent made *any* efforts to correct the conditions that were the basis for removal of the minor. We acknowledge that the record does not suggest that any services were available when respondent was in federal custody, and Ruffin testified that only limited services were available after he was in Cook County Jail. Nonetheless, Ruffin testified that even after she mailed a letter to respondent in October 2023 listing recommended services, he never responded to inquire about services. She also testified there is no record that he made any attempt to contact the agency to ask about his son. Respondent could have offered testimony of any such efforts at the termination hearing, but declined to do so. Given the lack of evidence of any effort made by respondent, we cannot say the trial court's finding that he failed to make "reasonable efforts" under subsection (m)(i) (750 ILCS 50/1(D)(m)(i) (West 2024) was against the manifest weight of the evidence.

¶ 74           Respondent's Challenge to the Best Interests Finding Is Meritless

¶ 75    We briefly address respondent's contention that the court erred in finding that it was in the minor's best interest to terminate his parental rights.

¶ 76    After a parent is deemed unfit, the court must conduct a second hearing to determine if termination of parental rights is in the child's best interest. *In re A.R.,* 2023 IL App (1st) 220700, ¶ 77; 705 ILCS 405/2-29(2) (West 2024). "At this phase, 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.'" *In re A.R.,* 2023 IL App (1st) 220700, ¶ 77. The State must prove by a preponderance of the evidence that

termination is in the minor's best interests. *Id*. "A reviewing court will not reverse a trial court's decision to terminate parental rights unless it is contrary to the manifest weight of the evidence. [Citation.]" *Id*.

¶ 77    In his briefing, respondent does not discuss any of the testimony at the best interests hearing, all of which indicated that the minor is in a safe and happy home, with foster parents willing to adopt him. Instead, respondent asserts his "claim for error here is not on the evidence, but that given the court's unfitness claim [sic] was in error, the court's finding of best interest must be vacated." Thus, his challenge to the best interest findings is dependent on his challenge to the unfitness findings.

¶ 78    We have already rejected respondent's challenges to the findings of unfitness. Accordingly, we also reject his challenge to the trial court's best interest finding. Thus, we affirm the court's order terminating respondent's parental rights.

¶ 79    Before we conclude, we note our recognition that as a practical matter, incarcerated parents who lack access to recommended services will find it more difficult to oppose a petition to terminate their parental rights pursuant to section 1(D)(m) of the Adoption Act, asserting a parent's failure to make "reasonable progress" or "reasonable efforts" in a given 9-month period. As the clock is running for parents facing such a petition, the Cook County Department of Corrections should strive to provide the services most often required of inmates who are in danger of losing their parental rights. This decision should not be read as accepting or condoning the apparent unavailability of any services to respondent by reason of his incarceration. Nevertheless, in this case there was no evidence that respondent ever sought to inquire about or participate in any of the recommended services; thus, the unavailability of certain services does not give us any reason to disturb the trial court's findings of unfitness.

¶ 80                               CONCLUSION

¶ 81     For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 82     Affirmed.